IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| EDWARD DAVID JAMES III,<br>Institutional ID No. 154390,<br><br>　　　Plaintiff,<br><br>v.<br><br>SARAH E. CLARK, *et al.*,<br><br>　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 2:25-CV-253-Z-BR |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
TO GRANT MOTION TO DISMISS COMPLAINT**

Before the Court is Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 16), and Motion for Reconsideration (ECF 10) filed by Plaintiff Edward David James III ("James"). For the reasons stated below, the Magistrate Judge recommends that Defendants' Motion be GRANTED and that James's Motion be DENIED as moot.

## I. INTRODUCTION

James brings this defamation action against Defendants Gray Local Media, Inc. ("Gray Media") and Sarah E. Clark ("Clark") (collectively, "Defendants") in response to Defendants' November 2025 news coverage of James's criminal conviction and subsequent extradition from New Jersey to serve his sentence. Specifically, James complains about two news stories disseminated by KFDA-TV in Amarillo: an online article authored by Clark titled "Amarillo man who refused to serve prison sentence extradited from New Jersey" that appears on KFDA-TV's website, and a presumably similar news story broadcast on KFDA-TV. He claims that the two pieces defamed him by saying that he "refused" to return to Texas, "evaded numerous law enforcement attempts to serve an arrest warrant," and that he was "caught outside of Texas." (ECF

3 at 3). James seeks a preliminary injunction, asking the Court to order Defendants: (1) to remove the offending article from KFDA-TV's website and to not republish it; (2) place a temporary notice on the article's URL stating "This article is currently unavailable pursuant to a federal court order pending litigation concerning its accuracy;" and (3) if the website article is republished after expiration of injunctive relief, to include a correction notice "accurately reflecting the procedural history and correcting the false statements identified in Plaintiff's complaint." (ECF 6 at 6).

James's request for a temporary restraining order and preliminary injunction initially was denied by the Court because he had neither paid the filing fee nor applied to proceed *in forma pauperis*, but he was given leave to re-urge his injunction request once the filing fee issue was resolved. (ECF 8). On December 11, 2025, James was granted leave to proceed *in forma pauperis*. (ECF 11). James filed the pending Motion to Reconsider his injunction request. (ECF 10). Defendants ask the Court to dismiss James's Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (ECF 16). James responded to the Motion on January 16, 2026 (ECF 23), and filed a sur-reply on February 17, 2026. (ECF 27).

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and footnote omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not establish facial plausibility. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 557). In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016).

The Court also is mindful it "must construe the pleadings of *pro se* litigants liberally … to prevent the loss of rights due to inartful expression." *Perez v. Dall. Cnty. Jail*, No. 3:20-cv-01761, 2022 WL 1215781, at *2 (N.D. Tex. Mar. 31, 2022) (internal citations omitted); *see also Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006). "But 'liberal construction does not require that the Court ... create causes of action where there are none.'" *Rolan v. LaSalle Sw. Corr.*, No. 3:20-cv-2842, 2021 WL 5568168, at *3 (N.D. Tex. Nov. 1, 2021) (quoting *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013)). While courts hold *pro se* plaintiffs to a more lenient standard than attorneys when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court also may consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to [his] claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). On a motion to dismiss a defamation claim, courts may consider the allegedly defamatory publications. *See Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.*, No. 19-CV-2074-G, 2021 WL 3618113 (N.D.

Tex. Aug. 16, 2021); *Nguyen v. Hoang*, 318 F.Supp.3d 983, 998 (S.D. Tex. 2018).

## III. FACTUAL BACKGROUND

### A.     James's Underlying Charge and Conviction.

The following facts are taken from James's Complaint and its attachments and court documents of which the Court takes judicial notice:

### 1.  The Underlying Charges.

In February 2020, the State of Texas issued an indictment charging James with family violence assault by occlusion ("intentionally, knowingly or recklessly impeding the normal breathing or circulation of [his then-girlfriend's] blood by applying pressure to her throat or neck"). *See James v. State*, No. 07-24-49-CR, 2025 WL 338308, at \*2 (Tex. App.--Amarillo Jan. 29, 2025), *pet. for discretionary review ref'd* (Apr. 16, 2025), *reh'g denied* (May 7, 2025). James was arrested on June 30, 2020. (ECF 3-1 at 8). He was released three days later on a $10,000.00 bond. (*Id.* at 8, 10).

While out on bond and awaiting trial, James moved to New Jersey (with permission of the court) to pursue a romantic relationship with his former seventh grade teacher, a relationship that began after both were adults. They later married. (ECF 3 at 6; ECF 3-1 at 15). However, he admits that he struggled with maintaining sobriety during this timeframe and relied on alcohol to help him with the PTSD he experienced after being released from prison on an earlier conviction unrelated to the 2020 charge.[1] (*Id*. at 7-9).

In January 2024, James voluntarily returned to Amarillo for trial, and a jury found him

---

[1]James states that he spent six years in prison on the unspecified earlier charge because "it's a felony crime for teens who are more than 3 years apart to have a sexually active consensual relationship. [His daughter's] mom and I were 3 years and 5 months apart (18 and 15, senior and sophomore). I spent 6 years in prison for it, which nearly destroyed my life." (ECF 3-1 at 6).

guilty of the charge. He was sentenced to five years in prison. *James*, 2025 WL at *2. After 31 days in jail, he was granted release on bond pending appeal. (ECF 3-1 at 9). The Texas trial court judge allowed him to return to New Jersey in August 2024. (*Id.*).

    **2.   Appeal of the Underlying Conviction and Extradition.**

On January 29, 2025, the Seventh Court of Appeals issued a Judgment and Memorandum Opinion affirming James's conviction. *James*, 2025 WL at *5. After the appellate court issued its opinion, James stopped checking in with his bondsman. (ECF 3-1 at 10). On February 3, 2025, the trial court issued a bond surrender warrant. (*Id*. at 12). On July 9, 2025, the appellate court issued its mandate. (*Id.* at 10, 12). On July 24, 2025, James turned himself in to the Ocean County, New Jersey, police department on an outstanding warrant. (*Id*. at 13). He was extradited to Texas on November 2, 2025, and booked into the Potter County Detention Center two days later. (*Id*. at 5).

    **3.   Defendants' News Coverage.**

On November 8, 2025, Defendants published an article on the KFDA-TV website, newschannel10.com, with the headline: "Amarillo man who refused to serve prison sentence extradited from New Jersey" (the "Article"). (ECF 3 at 3; ECF 3-1 at 2-5). The Article states its reliance on police reports, James's court records and James's website, www.StandWithEdwardJames.com, and describes the events leading up to James's extradition from New Jersey to Texas. (*Id*.). Describing James as a "man who went to extraordinary lengths to fight his conviction," the Article covers events leading up to James's criminal charge, his subsequent move to New Jersey, his conviction and his post-conviction activities. (*Id.*). A news story apparently was broadcast on KFDA-TV on or about November 9, 2025, (the "Broadcast") that alleged that James was "caught outside of Texas." (ECF 27).

On November 24, 2025, James filed his Complaint alleging that the Article and Broadcast

defamed him and harmed his reputation.

## IV. JAMES'S ALLEGATIONS OF DEFAMATION

**A.    James's Complaints About the Broadcast.**

Although James complains about statements made in the Broadcast, he provides only one statement from the Broadcast that he claims to be false: that the Broadcast stated he was "caught" outside of Texas. (ECF 27).

**B.    James's Complaints About the Article.**

James's Complaint alleges that the following statements from the Article are defamatory:

1.    The "headline, broadcast narration, and captions, as well as the structure and imagery of the article" "state or strongly imply" that James refused to serve his sentence, fled, and was "caught outside of Texas". (ECF 3 at 3).

2.    The claim that James "avoided many attempts by law enforcement to serve the arrest warrant" and remained a fugitive "for months." (*Id.*; ECF 23 at 2).

3.    That he "evaded" law enforcement. (ECF 23 at 1).

4.    That he surrendered "only after a belated 'discovery' of custody requirements." (*Id.* at 2).

5.    That he was told to return to Texas by February 1, 2025, to begin serving his sentence. (*Id.* at 11).

6.    Referring to his relationship with "an older married woman" who was "his 7th-grade teacher" and referencing his past struggles with alcohol as a current problem. (*Id.* at 5).

7.    Failing to show the context behind his PTSD, efforts towards sobriety, and various appeals of his sentence. (*Id.*). James alleges that "Defendants selectively extracted

6

isolated lines [from his website] and mischaracterized them to create the false impression of a man with a pattern of instability, deception or ongoing misconduct." (*Id*.).

## V. LEGAL ANALYSIS

### A.     James's Defamation *Per Se* Claim.

A statement is defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *USA Today v. Ryan, LLC,* No. 09-22-432-CV, 2024 WL 1914792 (Tex. App.--Beaumont 2024, pet. denied) (citing Tex. Civ. Prac. & Rem. Code § 73.001). To bring a claim for defamation under Texas law, the plaintiff must establish the following elements: (1) publication of a false statement of fact to a third party, (2) the statement must concern the plaintiff and be defamatory, (3) the publication must be made with the requisite degree of fault, and (4) the publication must cause damages. *Walker v. Beaumont Indep. Sch. Dist*., 938 F.3d 724, 743 (5th Cir. 2019) (citing *In re Lipsky*, 460 S.W. 3d 579, 593 (Tex. 2015)). The status of the person allegedly defamed determines the requisite degree of fault. A private individual needs to prove only negligence, but a public figure must prove actual malice. *Lipsky*, 460 S.W.3d at 593. Damages must be shown unless the statements are defamatory *per se* such that damages are presumed. Defamation *per se* "refers to statements that are so obviously harmful that general damages may be presumed." *Walker*, 938 F.3d 724, 743.

The first—and dispositive—question before the Court is whether Defendants made a false statement. "In a defamation suit against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity." *Walker*, 938 F.3d at 743. Courts uniformly hold that news stories regarding crimes and related proceedings are matters of "public concern". *See, e.g.,*

7

*Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975) ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions … are without question events of legitimate concern to the public…."); *see also Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017) ("Public matters include, among other things, 'commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions.'")(quoting *Cox*).

In determining whether a statement is false, Texas has adopted the substantial-truth doctrine, under which a plaintiff cannot prevail when the publication "correctly conveys a story's 'gist' or 'sting' although erring in the details." *Walker,* 938 F.3d at 743 (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). Such evaluation requires looking at the "gist", or meaning, of the allegedly defamatory statements, which is determined by "examining how a person of ordinary intelligence would view it." *Id.* (internal quotation omitted). "Thus, the court must determine if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, in the mind of the average person." *Id*. at 743-44 (internal quotation omitted). *See AOL, Inc. v. Malouf*, No. 05-13-01637-CV, 2015 WL 1535669, at *4 (Tex. App.--Dallas Apr. 2, 2015, no pet.) (news article was not substantially false although it stated that plaintiff had been charged with criminal Medicaid fraud when the charges were civil and despite the article using the words "charged" and "stolen"); *Basic Capital Mgmt., Inc. v. Dow Jones & Co.*, 96 S.W.3d 475, 481-82 (Tex. App.--Austin 2002, no pet.) (article stating that investment firm had been involved in money laundering was substantially true although only two employees had been charged with fraud and conspiracy, not money laundering, and company was only mentioned in indictment, but not charged).

### 1. Category One: "Refusal" to Return to Texas and Fugitive Status.

As shown above, James complains that the Article erroneously states that he "refused" to return to Texas to serve his sentence. Instead, James claims, he was lawfully residing in New Jersey while pursuing his post-conviction appeals in the Texas courts. He claims that the Article's statements depicting him as a fugitive who refused to return to Texas to serve his sentence were defamatory *per se* under Texas law.

At the outset, the Court notes that nowhere does the Article state that James was "caught outside of Texas," that he "fled" Texas or that he "evaded" law enforcement. (ECF 3-1). Therefore, these allegations do not support his defamation *per se* claim as to the Article. James also takes issue with the Article's claim that James "refused" to serve his sentence. (ECF 3 at 3). This assertion, however, is substantially true and thus cannot be considered defamation.

James undisputedly admitted in the Complaint that Texas had "ordered him back from NJ to serve his 5-year prison sentence" and "had put out a warrant for him," but that he "decided he could not buy a ticket and put himself on a plane to go back to Texas." (ECF 3-1 at 4, 12). In fact, the Article provides screen-shot excerpts from James's website so stating, and James does not dispute their accuracy. (*Id.*). James further admitted in the Complaint that he stopped checking in with his bondsman and determined that he "had to stand and continue the fight here in New Jersey." (*Id.* at 4, 9-10, 18, 20). He does not dispute the Article's statement that he "removed his ankle monitor and jammed the signal so that it could not be traced." (*Id.* at 4). In addition, James was charged by the State of Texas with tampering with an electronic monitoring device, bail jumping and failure to appear. *See* Case Nos. 88433-D-CR (tampering with a monitoring device) and Case No. 88352-D-CR (failing to appear and bail jumping), both currently pending in the 320th Judicial

9

District Court of Potter County, Texas. (ECF 16-2 at 17-18, 20-21, 69).[2]

While James contends that he had justifiable reasons to remain in New Jersey pending exhaustion of his post-conviction appeals, this contention goes to the reason behind his refusal to return to Texas to serve his sentence, not the truth of *whether* he refused to return to serve his sentence. The excerpts of his website shown in the Article, coupled with the additional information attached to his Complaint, undisputedly support the contention that James "refused" to return to Texas to serve his sentence, regardless of his reasons for remaining in New Jersey.

Similarly, James's contention that the Texas appellate court did not "uphold" his conviction until the appellate court issued its mandate in July 2025 has no merit. The appellate court issued its judgment on January 30, 2025, affirming (and "upholding") James's conviction. *See James*, 2025 WL at *5. (ECF 16-2 at 13).[3] The mandate issued on July 9, 2025, giving "official notice of the action of the appellate court, directed to the court below, advising the lower court of the appellate court's action and directing the lower court to have the appellate court's judgment duly recognized, obeyed, and executed." *Min v. H & S Crane Sales, Inc.*, 472 S.W.3d 773, 778-79 (Tex.

---

[2]James alleges that the indictments were issued only after publication of the Article and cannot retroactively justify statements made in the Article. However, Defendants may rely on subsequent events unknown at the time of publication to support the substantial truth of the publication because the subsequent events "merely confirmed what in fact had already occurred." *NW Commc'ns of Tex. Inc. v. Power*, No. 05-99-1641-CV, 2000 WL 1036327 at *9 (Tex. App.--Dallas July 28, 2000, pet. denied). James "confuses subsequent confirmation of a true statement with newly created events" and Defendants "are not attempting to justify a false statement" based on the later events. *Id*. Although the indictment was not publicly filed until after the Article was published, the criminal charges (and the alleged conduct upon which they were based) occurred before the Article was published and are a matter of public record. (ECF 16-2 at 15, 17-18, 69).

[3]"A mandate is an appellate court's formal command requiring the lower court to comply with the appellate court's judgment." *In re Estate of Tillotson*, 647 S.W.3d 447, 457 (Tex. App.--Texarkana 2022, pet. denied) (quoting *Scott Pelley P.C. v. Wynne*, 578 S.W.3d 694, 699 (Tex. App.--Dallas 2019, no pet.)); *see also* Tex. R. App. P. 18, 51.1, 65.2. The appellate court's mandate and judgment do not limit the trial court's jurisdiction to preside over the case but instead limit the trial court's authority in exercising that jurisdiction. *Phillips v. Bramlett,* 407 S.W.3d 229, 234 (Tex. 2013).

App.--Houston [14th Dist.] 2015, pet. denied). The Article's statement that his conviction was "upheld" by the appellate court was not false. The date it became final is irrelevant to the truth of the statement. (ECF 3-1 at 4).

James also contends that the Article's statement that he "remained a fugitive for months" is defamatory because, although the appellate court's opinion affirming his conviction was issued on January 30, 2025, the mandate was not issued until July 9, 2025, so, as a result, he claims that he was not required to return to Texas to serve his sentence until that date. (ECF 23 at 5). James alleges that the Article, by "collapsing the February administrative entry [bond revocation] with the July appellate mandate, Defendants created a wholly false narrative that [James] defied a lawful order to commence punishment, thereby reinforcing their defamatory theme that he 'refused to serve his sentence' and was a fugitive." (ECF 3 at 11). He further points out that he voluntarily surrendered to New Jersey authorities on July 24, 2025, and, thus, claims that the term "fugitive" does not accurately describe his status.

"Fugitive" is defined under Texas law as "a person for whom a valid arrest warrant has been issued." *See* TEX. PEN. CODE 38.01(5). An excerpt from James's website attached to his Complaint as an exhibit admits that

> [o]n January 29, 2025, I lost my first appeal. My PTSD returned full force. After years of perfect compliance, I couldn't bring myself to check in with my bondsman out of sheer paralysis and anxiety. **My bond was revoked** while I waited on my second appeal.

(ECF 3-1 at 9) (emphasis added). The exhibit further shows that "a bond surrender warrant issued on February 3, 2025" and that **"[y]ou will see in public records he was 'arrested' as a 'fugitive'**…" (*Id*. at 10) (emphasis added).  Because the allegation that James was a "fugitive" for at least a portion of his post-appeal stay in New Jersey is substantially true, it does not support a defamation claim. The issue of when he became a "fugitive" is immaterial, since he was, in fact, a

11

"fugitive" regardless of whether the state of Texas attempted to execute the warrant. Whether he became a fugitive when his bond was revoked or when his conviction was upheld and the mandate issued is a distinction without a difference. He was a "fugitive" as defined by Texas law. The Article accurately reported James's fugitive status, as reflected by both public record and the excerpts from James's website as cited in the Article.

The Article's assertion that James voluntarily surrendered "only" because "he discovered that the 'wrongful conviction' process in Texas can only happen when the person is in custody" does not change the Court's determination that James has failed to show that the Article, as a whole, is defamatory. While the Article alleges that James voluntarily surrendered "only" after discovering that he must be in custody to bring a wrongful conviction claim, James's website excerpts shown in the Article state simply that James "turned himself in to our county jail to fight extradition and begin the Habeas Corpus (wrongful imprisonment) process, which can only work if one is in custody." (ECF 3-1 at 4). Even assuming that the Article's statement about the motivation behind his voluntary surrender is false does nothing to alter the fact that the Article is substantially true. While it may not have been his "only" motivation in turning himself in, James admits on his website—as shown in the website excerpts in the Article attached to his Complaint— that at least one motivation for turning himself in was to "fight extradition and begin the Habeas Corpus (wrongful imprisonment) process." (*Id.*).

Conversely, there is no apparent support in the Complaint, Defendants' exhibits or public records (the only items that the Court may consider at this stage) that James "avoided many attempts by law enforcement to serve the arrest warrant" as alleged in the Article. (*Id.*). In fact, James contends that the State of Texas never attempted to serve an arrest warrant on him. (ECF 3 at 4). The Article quotes James's website, which states that he realized that "Texas had put out a

warrant for him" but he "could not buy a ticket and put himself on a plane to go back to Texas knowing how wrong this all was." (ECF 3-1 at 4). The July 24, 2025, New Jersey arrest report notes that James turned himself in "on an outstanding warrant." (*Id*. at 10, 13). However, public records do not indicate that Texas ever attempted to serve an arrest warrant on James.[4] Nor does there appear to be any support for the Article's statement that "James was told to return to Texas by Feb. 1 to begin serving his sentence." (*Id*. at 4).

Even assuming the falsity of these two statements, however, they do not render the entirety of the Article defamatory. In determining whether a publication is defamatory, the Court must look at the entire publication rather than at individual sentences or portions of the communication. Whether a publication is false and defamatory depends upon a reasonable person's perception of the entire publication. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (defamation determined by looking at entire communication); *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 158-59 (Tex. 2004) ("The question … is to be answered by considering the entire context in which the offending material appears."); *Schauer v. Mem'l Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.--Houston [1st Dist.] 1993, no pet*.), disapproved on other grounds by Huckabee v. Time Warner Entmt. Co.*, 19 S.W.3d 413 (Tex. 2000), 856 S.W.2d at 446 ("To determine if a publication is defamatory, the court must look at the entire communication and not examine separate sentences or portions."); *Parker v. Spotify USA, Inc.*,  569 F. Supp.3d 519 528-29 (W.D. Tex. 2021) ("Additionally, it is well settled that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.") (internal quotation omitted).

---

[4]James's Complaint admits that his website was edited only after the Article was published to add "[w]hile there was a bond surrender warrant issued on February 3, 2025, no law enforcement agency ever attempted to serve it." (ECF 3-1 at 10).

The statements do not change the "gist" of the Article, which essentially recounts James's efforts to fight both his conviction and his return to Texas to serve his sentence. Evading service of an arrest warrant is no more damaging to James's reputation than the true statements in the Article that recounted his actions of (1) disabling his tracker; (2) refusing to check in with his probation officer; (3) having a warrant issued; (4) unilaterally deciding to stay in New Jersey to "continue the fight"; and (5) belatedly turning himself in on an outstanding warrant.[5] Under the authorities cited above, the entirety of the Article remains substantially true, "although erring in the details." *Walker,* 938 F.3d at 743. The Article, as a whole, is no more damaging to James's reputation than a completely truthful article would have been "in the mind of the average person." *Id.* at 743-44.[6]

His claim based on the Broadcast fails as well. He complains only that the Broadcast stated he was "caught outside of Texas." However, he provides no transcript, recording or other memorialization in his Complaint of the entirety of the Broadcast. Accordingly, the Court is unable to review the Broadcast to determine if the "gist" of the Broadcast was, in fact, defamatory. *See Turner*, 38 S.W.3d at 115 (defamation determined by looking at entire communication). Under the authorities cited above, the Court must determine "a reasonable person's perception of the entirety of a publication and not merely on individual statements" to determine if the Broadcast was defamatory. *Parker,* 569 F. Supp.3d at 528-29. Without more information as to the contents of the Broadcast beyond the one sentence, James has failed to state a valid defamation claim as to the

---

[5]James blames the delay in turning himself in after the mandate issued on his New Jersey on his attorney being on vacation. Again, this goes to the reason behind him remaining in New Jersey, not the truth of whether he remained in New Jersey after the mandate issued, and he alleges no facts to show that Defendants knew the reason for the delay.

[6]The Court assumes for the purposes of this Motion that James's reputation, as evidenced by his post-conviction rehabilitation efforts (*see* ECF 3-1 at 14-15), is not libel-proof, as claimed by Defendants in their Motion.

Broadcast. His cause of action as to the Broadcast should be dismissed.

### 2. Category Two: statements about James's personal life.

The statements made about his personal life also were substantially true. His Complaint shows that he did, in fact, marry an older woman who formerly was his seventh-grade teacher. (ECF 3 at 6). While the Article did not specify that both James and his teacher were adults at the time they initiated their personal relationship, it did not say (or even suggest) that they were not, although it did not state that the two eventually married.

The Article makes two references to James's admitted bouts with alcohol. First, it states that "[h]e also confesses to heavy drinking through his time on bond in New Jersey." (ECF 3-1 at 3). The statement was made in a section of the Article discussing his time in New Jersey before his trial. (*Id*.) Secondly, the Article states that "he does confirm that he struggled with alcohol abuse in the same timeframe." (*Id*. at 5). This statement was made in the context of discussing the underlying charges that led to his conviction. (*Id*.) In addition, the Article includes a website excerpt stating:

> As you may have read on here, after sentencing, the judge released him on bond pending appeal in Feb of 2024 and allowed him to live back in New Jersey. He continued his life as before, leading sobriety classes through the nonprofit he created called Phoenix Reformation, attending college to become a chaplain, and connecting with his Men's Bible Study group at our local church.

(*Id*. at 4). Taking the Article as a whole, both statements of which James complains clearly refer to past events, and nowhere does the Article conflate his past struggles with alcohol and his current sober status. They do not support James's defamation *per se* claim.

In summary, the face of the Complaint, as well as court records of which this Court takes judicial notice, show that the Article is substantially true and, accordingly, does not state a plausible claim. James's defamation *per se* claim should be dismissed.

15

**B.**     **Defamation by implication.**

A defamation by implication claim arises "when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). Defamation by implication "may emerge from a publication or broadcast's discrete parts" and "includes necessary logical entailments as well as meanings that are merely suggested." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 629 (Tex. 2018).  It "refers to ... inferential, illative, suggestive, or deductive meanings." To determine defamation by implication, the court must "determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw." *Id*. at 629. The court must "not place overwhelming emphasis on any single term or focus on individual statements to the exclusion of the entire publication." *Id*. at 631 (internal quotation omitted). The *Tatum* court held that

> [I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.

*Id*. at 635 (emphasis in original) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)). Thus, a plaintiff who seeks to recover based on a defamatory implication—whether a gist or a discrete implication—must point to "additional, affirmative evidence" within the publication itself that suggests the defendant "intends or endorses the defamatory inference." *Id*. The evidence of intent "must arise from the publication itself" and be evident when evaluating the publication objectively. *Id*. at 635.

In his defamation by implication claim, James again takes issue with the word "fugitive,"

16

alleging that Defendants "deliberately conflated this technical legal term with its ordinary, pejorative meaning, thereby creating the false and damaging impression that [James] was actively fleeing justice." (ECF 3 at 12.). However, he alleges no "additional, affirmative evidence" evident in the Article to show that Defendants intended a defamatory meaning instead of intending to quote public records that labeled James as a "fugitive." In addition, the Article specifically acknowledged that James's website states that "he is not a fugitive and was only residing in New Jersey because Texas allowed him to." This allegation does not support a defamation cause of action.

James also complains that the Article's "structure, framing, headline, and selective omissions were designed to create the false impression that [James] fled justice, was hiding, and was apprehended as a fugitive." (*Id.*). He complains about the use of his mugshot twice, once superimposed over a map of the United States with a line from New Jersey to Texas, and both with the statement that he "refused to serve his prison sentence." (*Id.* at 12-13). He claims that such illustrations "deliberately reinforced the false narrative that [James] defied lawful authority and had to be hunted down and returned to Texas." (*Id.* at 13). As discussed above, use of the term "fugitive" is not defamatory, nor is the statement that James refused to return to Texas. Further, he does not plausibly allege that the mugshot was false in any way. The map with the line between New Jersey and Amarillo accurately illustrates James's extradition. Nowhere does the Article state that he "fled justice" or "was hiding." The Article's "structure, framing [and] headline" do not support James's defamation claim, nor has he alleged plausible additional evidence to indicate Defendants' defamatory intent as to the structure, frame or headline.

Next, James objects that the Article "quoted the assault allegations in detail and relied exclusively on the State's appeal brief" in discussing the underlying charges, while omitting any reference to his defenses, including that the investigation was flawed. (*Id.* at 15-16). He also

17

complains that the Article referred to his defense solely in a reference to his website "containing excerpts of the trial transcript" and frames his efforts as "merely an attempt to 'discredit' others," thereby furthering "the false and damaging impression that [James's] claims are baseless, rather than legitimate and supported by evidence." (*Id*. at 16). The Court disagrees. The Article references his website, its contents and discussions of his claim of innocence, and provides a link to the website itself. It also acknowledges that James's appeal focused on challenging the veracity of the screenshots provided by the victim. (ECF 3-1 at 4).

He also complains that, while his website stated that he "didn't recognize some of the [Facebook] messages [to the victim], the Article stated that "James himself acknowledges a faint memory of receiving the messages." (*Id*. at 16). He claims that the Article, "[b]y claiming [James] 'acknowledged' the messages while disregarding this clear statement disputing their authenticity, Defendants inverted the meaning of the quoted source and presented contested, late-disclosed evidence as admitted fact." (*Id*.). Saying that he "didn't recognize some of the messages" is a far cry from being a "clear statement disputing their authenticity." While James may have wished for more extensive coverage of his defenses, the fact that the Article does not entirely recount his version of events does not imply a defamatory intent by Defendants and thus does not support his claim of defamation by implication.

Lastly, James re-urges his claims addressed above: that (1) the Article omitted his five years of sobriety and his role as a recovery counselor, and it implies that quotes from his website about his alcoholism as current (*Id*. at 13-14); (2) the Article "stripped away the context of voluntary surrender" and claims he turned himself in only because he could not start his wrongful conviction appeals until he was in custody so it appeared that he "acted manipulatively" (*Id*. at 14-15, 17); (3) that Defendants failed to explain that a criminal sentence is not enforceable until the

appellate court issues its mandate, so the Article gave "the false impression that [James] was defying a lawful order or evading justice, when in fact he was acting in compliance with the law and court procedure.[7] (*Id.*). For the reasons stated above, these statements are substantially true and James has not plausibly alleged that Defendants intended the defamatory connotation that he now ascribes to them.

Taking all of James's allegations as a whole, he does not plausibly allege that the entirety of the Article creates a defamatory inference, nor does he allege any "additional, affirmative evidence" within the Article to suggest that Defendants intended or endorsed a defamatory inference. *Tatum*, 554 S.W.3d at 635. The Article as a whole did not misrepresent James's story as evidenced in the Complaint and public records. "Given that [defendant] accurately reported facts, albeit not all of the facts, whether or not the story painted [plaintiff] in an attractive light is irrelevant." *Green v. CBS Inc.*, 286 F.3d 281, 285 (5th Cir. 2002); *see also Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.*, 64 S.W.3d 506, 515-16 (Tex. App.--Corpus Christi 2001, pet. denied) (holding defendant "cannot be liable for presenting a true account of events, regardless of what someone may infer from the account"). Because the Article did not create a substantially false and defamatory impression of James's actions and he does not refer to "additional affirmative evidence" within the Article showing that Defendants intended a defamatory meaning, he has failed to state a viable defamation by implication claim, and such claim should be dismissed.

**C.       Intentional Infliction of Emotional Distress and Negligence.**

James's state-law claims of Intentional Infliction of Emotional Distress and Negligence

---

[7]He does not explain how disabling his tracking device and failing to check in with his probation officer constitute "acting in compliance with the law and court procedure."

based on the Article and the Broadcast should be dismissed as well. "The Texas Supreme Court has expressly refused to recognize causes of action that merely duplicate the remedy of defamation and are creatively pled in an attempt to avoid the constitutional protections mandated by the First Amendment and the Texas Constitution." *Texas Beef Grp. v. Winfrey*, 11 F. Supp.2d 858, 864 (N.D. Tex. 1998), *aff'd*, 201 F.3d 680 (5th Cir. 2000); *see also Provencio v. Paradigm*, 44 S.W.3d 677 (Tex. App.--El Paso 2001, no pet.) ("The same protections which the First Amendment affords defendants from libel claims also protect them from non-libel claims that are based on the same defamatory publication.").

A claim for intentional infliction of emotional distress is a "gap-filler" tort, "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has *no* other recognized theory of redress." *Butler v. Collins*, 714 S.W.3d 562, 570 n.13 (Tex. 2025) (quoting *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005). James's negligence claim fares no better. *See Bird v. W.C.W.*, 868 S.W.2d 767, 772 n.7 (Tex. 1994) ("[I]t would be ironic if an individual could avoid all the constitutional restrictions on defamation actions merely by disguising such claim in negligence terms."). Because James's emotional distress and negligence claims are based on the same publications that form the basis for his defamation claim, such claims should be dismissed for the reasons stated above. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (the First Amendment "can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress").

**D.      Leave to Amend.**

Ordinarily, a *pro se* plaintiff should be granted leave to amend his complaint prior to dismissal. *Brewster v. Dretke*, 587 F.3d 764, 767-68 (5th Cir. 2009). The district court is not

required to allow such an opportunity, though, if the plaintiff's claims are clearly frivolous, *Eason v. Thaler*, 14 F.3d 8, 9 (5th Cir. 1994), or if the plaintiff has pleaded his best case in the current complaint. *Mendoza-Tarango v. Flores*, 982 F.3d 395, 402 (5th Cir. 2020). James has clarified his Complaint in his sur-reply after being apprised of its deficiencies in Defendants' initial Motion to Dismiss, yet failed to correct them sufficiently to state a claim. Under these circumstances, the Court concludes that granting leave to amend would be futile and cause needless delay.[8]

## VI. RECOMMENDATION

For the reasons stated above, the Magistrate Judge concludes that Defendants' Motion to Dismiss pursuant to Rules 12(b)(6) (ECF 16) should be GRANTED and James's Motion for Reconsideration (ECF 10) should be DENIED as moot.

## VII. INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Findings, Conclusions and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED March 30, 2026.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is

---

[8]That notwithstanding, the 14-day objection period will permit James the opportunity to proffer factual and/or legal bases, if any, to cure the deficiencies in his claims outlined herein.

fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir. 1988).